609 A.2d 757

GAIL MANNA, GENERAL ADMINISTRATRIX AND ADMINISTRA-
TRIX AD PROSEQUENDUM OF THE ESTATE OF JOSEPH
MANNA, DECEASED, PLAINTIFF–APPELLANT, v. STATE OF
NEW JERSEY AND NEW JERSEY DEPARTMENT OF TRANS-
PORTATION, DEFENDANTS–RESPONDENTS.

Argued March 16, 1992—Decided July 21, 1992.

*Mitchell J. Makowicz, Jr.,* argued the cause for appellant (*Blume, Vazquez, Goldfaden, Berkowitz & Donnelly,* attorneys; *Ronald P. Goldfaden,* on the brief).

*Glenn R. Jones,* Deputy Attorney General, argued the cause for respondents (*Robert J. Del Tufo,* Attorney General of New Jersey, attorney; Mary C. Jacobson, Deputy Attorney General, of counsel).

The opinion of the Court was delivered by

GARIBALDI, J.

In 1986 Joseph Manna was killed in a car accident on a wet and slippery bridge. Gail Manna, the General Administratrix and Administratrix ad Prosequendum of the Estate of Joseph Manna, sued the State Department of Transportation based on the bridge's dangerous condition. We address the State's liability under the New Jersey Tort Claims Act, *N.J.S.A.* §§ 59:1-1 to 12-3 (the Act), the statute governing tort suits against public entities. The Act creates an underlying presumption of immunity, *N.J.S.A.* § 59:2-1, unless liability is specified. Even when that liability exists, however, it may be subject to specific statutory immunities. In this appeal we address the applicability of two such immunities: (1) the immunity for dangerous conditions caused solely by the weather, *N.J.S.A.* § 59:4-7; and (2) the immunity for dangerous conditions attributable to the plan or design of the public property, *N.J.S.A.* § 59:4-6.

I

In July 1986 Joseph Manna was driving northbound on Route 35 toward the Matawan Creek Bridge in Aberdeen. The bridge was wet from an earlier rain and very slippery. As Manna

approached the bridge, the driver of the car in front of him applied his brakes. In response, Manna applied his brakes. When the car reached the open-steel-grid deck of the bridge, it slid out of control and into the oncoming lane of traffic, striking another car head-on. Ten days later Manna died from his injuries.

The bridge was originally built as a drawbridge in the 1920s. When the present bridge was constructed in 1960, the wood-block deck was replaced by an open-steel-grid deck. The steel grid was constructed with raised blocks to prevent skidding. According to plaintiff's expert, by the time of the accident the raised blocks had worn down and created a smooth surface that would "retain a water film and allow hydroplaning." Numerous accidents had been associated with the bridge in the past.

Gail Manna, the Administratrix for Joseph Manna's estate, filed a survival and wrongful death action against the State of New Jersey and the State Department of Transportation (State) under the New Jersey Tort Claims Act. She alleged that by failing to provide adequate warnings and failing to install metal studs to prevent skidding, the State was liable for the dangerous condition it had created. Because plaintiff has conceded that *N.J.S.A.* § 59:4-5 grants immunity for the failure to post warning signals, that issue is no longer in dispute.

The State moved for summary judgment. Reviewing the condition of the bridge, the trial court held that "the plaintiff would be able to establish a *prima facie* case that a dangerous condition existed." However, the court noted that the purpose of the Act was to grant immunity, and that "any immunity provisions provided in the Act, or by common law, will prevail over the liability provisions." Finding that "the sole cause of the accident was the wet condition of the * * * bridge deck," the court held that § 59:4-7, the weather-immunity provision, provided the State with immunity from Manna's suit. The court also held that the plan-or-design immunity, § 59:4-6, protected the State from liability for Manna's injuries. The

court reasoned that the immunity was designed to be perpetual, and hence protected the State from liability when its original design choice proved hazardous. The court therefore granted the State's motion for summary judgment.

The Appellate Division affirmed in an unpublished opinion. The court rested its holding on the trial court's reasoning, but specifically declined to express an opinion concerning the applicability of the plan-or-design immunity.

We granted Manna's petition for certification. 127 *N.J.* 552, 606 *A.*2d 365 (1991).

## II

In 1972 the Legislature passed the New Jersey Tort Claims Act in response to the judiciary's weakening of the traditional doctrine of sovereign immunity. *See Rochinsky v. State, Dep't of Transp.*, 110 *N.J.* 399, 404, 541 *A.*2d 1029 (1988) (describing Act's history). Although the Legislature recognized that the strict application of the doctrine of sovereign immunity could lead to inequitable results, it chose to create an initial presumption of immunity to limit State liability. The Legislative Declaration states that

> the area within which government has the power to act for the public good is almost without limit and therefore government should not have the duty to do everything that might be done. Consequently, it is hereby declared to be the public policy of this State that public entities shall only be liable for their negligence within the limitations of this act and in accordance with the fair and uniform principles established herein.
>
> [*N.J.S.A.* § 59:1–2.]

Section 59:2–1(a) makes the presumption of immunity explicit, stating that "[e]xcept as otherwise provided by this act, a public entity is not liable for an injury * * *." (footnote omitted). The official comment to the section states that limiting liability to statutorily-created areas will enable the State to foresee and plan for the costs of any future liability. *N.J.S.A.* § 59:2–1 cmt. (quoting reasoning of California Law Revision Commission with regard to that state's similar Tort Claims Act).

When the Act does establish liability, that liability is in turn subject to specific immunities created by the Act, as well as to any common law defenses. *N.J.S.A.* § 59:2-1(b). According to the official Comment, the section "is intended to insure that any immunity provisions provided in the act or by common law will prevail over the liability provisions." As we have frequently recognized, "'immunity is the dominant consideration of the Act.'" *Rochinsky, supra,* 110 *N.J.* at 408, 541 *A.*2d 1029 (quoting *Kolitch v. Lindedahl,* 100 *N.J.* 485, 498, 497 *A.*2d 183 (1985) (O'Hern, J., concurring)).

## III

Section 59:4-2 of the Act creates public liability for dangerous conditions on public property. The statute defines a "dangerous condition" as "a condition of property that creates a substantial risk of injury when such property is used with due care in a manner in which it is reasonably foreseeable that it will be used." *N.J.S.A.* § 59:4-1(a). A public entity will be liable for a dangerous condition on its property

> if the plaintiff establishes that the property was in dangerous condition at the time of the injury, that the injury was proximately caused by the dangerous condition, that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred, and that either:
>
> a. a negligent or wrongful act or omission of an employee of the public entity within the scope of his employment created the dangerous condition; or
>
> b. a public entity had actual or constructive notice of the dangerous condition under section 59:4-3 a sufficient time prior to the injury to have taken measures to protect against the dangerous condition.
>
> Nothing in this section shall be construed to impose liability upon a public entity for a dangerous condition of its public property if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable.
>
> [*N.J.S.A.* § 59:4-2.]

In deciding a summary-judgment motion, we accept all of the facts presented by plaintiff as true and draw all reasonable inferences in the light most favorable to plaintiff. *Judson v. Peoples Bank & Trust Co. of Westfield,* 17 *N.J.* 67, 74-75, 110 *A.*2d 24 (1954). Plaintiff relied on an expert report provided by

Dr. Richard A. Haber, a professional engineer. He stated that the original steel-grid pattern constructed in 1960 had "presented square ends and sharp edges to directional traffic and acted as a deterrent in the 1960 era of lesser speeds and different tread tires." The raised portions have now worn away, leaving a "smooth, skidprone surface." The expert concluded that the existing structure will retain a film of water and allow hydroplaning. He noted that the vehicle's tires had had good tread and so were probably not the cause of skidding, and noted the police report's observation that the bridge surface was "very slippery." Because forty-eight accidents had occurred on the road between January 1975 and July 1986, he indicated the State had to have been on notice of the dangerous condition of the bridge.

The trial court held that plaintiff had presented a *prima facie* case demonstrating that the bridge presented a dangerous condition. On appeal, the State did not contest that conclusion. However, plaintiff cannot proceed to demonstrate the State's liability for that dangerous condition under § 59:4–2 until the applicability of the Act's specific immunities to liability is determined.

## IV

Both the trial court and the Appellate Division held that the State was immune from liability under the Act's provision establishing immunity for injuries caused solely by inclement weather. Section 59:4–7 states:

Neither a public entity nor a public employee is liable for an injury caused solely by the effect on the use of streets and highways of weather conditions.

We recently interpreted that provision in *Pico v. State*, 116 *N.J.* 55, 560 *A.*2d 1193 (1989). In *Pico*, plaintiff had pulled off the road due to extremely icy conditions. As she was walking along the side of the road to reach a telephone, another car skidded on the ice and struck her, causing serious injuries. The State had been informed of the hazardous conditions three

hours earlier but had not yet responded. We concluded that "under the Tort Claims Act the State may be liable for the failure to correct a known pre-existing dangerous condition unrelated to the weather, but * * * it is immune from liability for such a condition caused solely by weather." *Id.* at 61, 560 *A.*2d 1193. Because the State had done nothing to exacerbate the naturally-dangerous character of the weather, we were "left with the inescapable fact that the sole cause of the accident was the icy condition in its natural state." *Ibid.* We concluded that the "[i]mposition of liability in this context would undermine the policy judgment made by the Legislature that a public entity should be immune for an injury caused solely by the effect on the use of a highway of weather conditions." *Ibid.*

*Pico* relied on several lower-court cases. In *McGowan v. Borough of Eatontown*, 151 *N.J.Super.* 440, 376 *A.*2d 1327 (App.Div.1977), a negligently-constructed driveway caused water to spill onto the adjoining highway, where it accumulated due to improper drainage. When it froze, the icy road surface caused the plaintiff to lose control of his car. The court reversed the Law Division's grant of summary judgment in favor of the State, holding that the plaintiff should have had the opportunity at trial to demonstrate that causes in addition to the weather, such as the negligent construction of the driveway or the State's negligent maintenance of the highway, had contributed to the accident. *Id.* at 447–49, 376 *A.*2d 1327.

In *Meta v. Township of Cherry Hill*, 152 *N.J.Super.* 228, 377 *A.*2d 934 (App.Div.), *certif. denied*, 75 *N.J.* 587, 384 *A.*2d 818 (1977), a clogged ditch caused water to flow onto the road. The accumulated water froze and caused the plaintiff's car to skid out of control. As in *McGowan*, the court reversed the Law Division's grant of summary judgment in favor of the public entity, holding that the plaintiff should have had the opportunity to demonstrate at trial that causes in addition to the weather, such as the county's failure to alleviate or warn of the

dangerous condition, had contributed to the accident. *Id.* at 232, 377 *A.*2d 934.

In *Horan v. State,* 212 *N.J.Super.* 132, 514 *A.*2d 78 (App.Div. 1986), a bridge froze before the surface of the roadway. The plaintiff argued that the injury had not been caused solely by the weather but was also caused by the State's failure to warn of the condition. The court held that the failure to warn, alone, could not be deemed a contributory cause, and that such a broad interpretation of causation would render the weather immunity meaningless. *Ibid.* The court held that "[i]t is only when the weather contributes to the accident and injury in combination with a protagonist partner, [such as the filled ditch] in *Meta* * * * and the [negligently-constructed driveway in] *McGowan* [,] * * * that a public entity loses the immunity * * *." *Ibid.*

██  Although the State insists that the weather was the sole cause of the accident, it really seems to be arguing that "but for" the adverse weather, no accident would have occurred. That may well be true. However, the plain language of the statute offers immunity only when the weather is the *sole* cause of an accident, not when it is a "but for" cause in conjunction with other factors.

If an accident is caused by a factor in addition to the weather, that factor will preclude the applicability of the weather immunity regardless of whether the State is ultimately liable for that additional factor. Accordingly, if the condition of the bridge contributed to the accident, the weather immunity will not apply, even if another immunity protects the State from liability for that condition.

We are thus presented with the question of whether, making all inferences in plaintiff's favor, the facts of this case are closer to those in *Pico* and *Horan,* in which the courts upheld the public entity's reliance on the immunity, or those in *Meta* and *McGowan,* in which the courts required a jury trial to

determine factual questions regarding the existence of a contributory cause.

The State argues that the wet pavement caused by recent rain was the sole cause of the accident, and that the weather immunity thus applies. As in *Pico*, the State's failure to ameliorate the dangerous condition caused by the rain does not constitute an additional cause.

Plaintiff argues that the condition of the bridge was itself a contributing factor, unlike the icy road in *Pico* and the frozen bridge in *Horan*. Recognizing that the weather immunity is designed to protect the State from liability for the dangerous conditions created by adverse weather, plaintiff stresses that she is not arguing that the State had a duty to dry off the bridge. Rather, plaintiff argues that the jury should decide if the State's negligence in not maintaining the bridge was a contributory cause akin to the potential contributory causes noted in *Meta* and *McGowan*.

■ The burden of proof in establishing the applicability of the immunities rests with the public entity. *Kolitch v. Lindedahl, supra,* 100 *N.J.* at 497, 497 *A.*2d 183; *Birchwood Lakes Colony Club v. Borough of Medford Lakes,* 90 *N.J.* 582, 600, 449 *A.*2d 472 (1982). Reviewing the facts and drawing all inferences in favor of plaintiff, we hold that the trial court could not properly conclude that the State had met its burden of proof in establishing the applicability of the weather immunity. The poor condition of the bridge's surface could have contributed to the natural danger presented by the wet road surface. Unlike the situation in *Pico*, a jury could infer that natural conditions were *not* the sole cause of the accident.

Plaintiff's expert's testimony that the smooth patterning of the metal grid could "retain a water film and allow hydroplaning" suggests that the bridge's structure rendered the rainfall more dangerous than it would be naturally. Like the filled ditch in *Meta* and the driveway in *McGowan*, the jury could infer that the worn condition of the bridge was a "protagonist

partner" in causing the accident. If the condition of the bridge repeatedly turned a naturally-benign weather condition such as rain into a treacherous condition, then the rain cannot be considered the *sole* cause of the accident.

■ The existing record does not resolve the material factual question of whether the bridge's dangerous condition contributed to the weather in causing Manna's accident. The trial court's grant of summary judgment was therefore improper.

## V

The State also asserts that it is immunized from suit by the Tort Claims Act's plan-or-design immunity. *N.J.S.A.* § 59:4–6(a) states:

> Neither the public entity nor a public employee is liable * * * for an injury caused by the plan or design of public property, *either in its original construction or any improvement thereto,* where such plan or design has been approved in advance of the construction or improvement by the Legislature or the governing body of a public entity or some other body or a public employee exercising discretionary authority to give such approval or where such plan or design is prepared in conformity with standards previously so approved.
>
> [Emphasis added.]

The official Comment to that section explains that plan-or-design immunity is intended to protect the independence of the government's discretionary decisions and to protect the State from unlimited financial responsibility. It states:

> This broad immunity is prompted by the fact that approval of plans or designs is peculiarly a function of the executive or legislative branch of government and is an example of the type of highly discretionary governmental activity which the courts have recognized should not be subject to the threat of tort liability. * * * In addition, this particular area of governmental activity provides a very broad and extensive amount of exposure to liability against which the State would have difficulty providing economical and adequate protection. This immunity is similar to the immunity provided by judicial decision in the State of New York * * * and by legislation in the State of California.

Summing up the "thesis of discretionary immunity," the Comment states that "a coordinate branch of government should not be second-guessed by the judiciary for high level policy

decisions." *See Thompson v. Newark Hous. Auth.*, 108 *N.J.* 525, 534, 531 *A.*2d 734 (1987).

■ Application of plan-or-design immunity turns on whether the public entity has approved the feature in question so as to immunize it from challenge. As we stated in *Thompson, supra,* "[o]ur case law has accepted * * * [the] premise that the defect that causes the injury must be in the plans before immunity is conferred." 108 *N.J.* at 535, 531 *A.*2d 734. In other words, "the public entity must establish that an approved feature of the plan sufficiently addressed the condition that is causally related to the accident." *Id.* at 536, 531 *A.*2d 734; *accord Birchwood Lakes, supra,* 90 *N.J.* at 599, 449 *A.*2d 472; *Costa v. Josey,* 83 *N.J.* 49, 52, 415 *A.*2d 337 (1980); *Ellison v. Housing Auth. of S. Amboy,* 162 *N.J.Super.* 347, 351, 392 *A.*2d 1229 (App.Div.1978).

The trial court found that plaintiff did not contest that "the actual bridge deck[ ] was constructed in conformity with the standards previously approved by the authorized entity or person." Moreover, the evidence supports the conclusion that the surface of the bridge was constructed according to approved plans. The State submitted an affidavit from a Regional Director of the New Jersey Department of Transportation, Nicholas J. Cifelli, which stated that "[t]he design of the * * * bridge, including but not limited to the * * * *steel grid section* * * * was approved in advance of construction by the State Highway Commissioner and public employees exercising discretionary authority * * * to give such approvals." (emphasis added.) He further stated that "[t]he bridge was constructed in accordance with the * * * plans[,]" and that the bridge "was substantially the same as was shown in the various as-built plans." No improvements have been made to the bridge deck since its original installation.

In addition, *plaintiff*'s expert presented evidence that the original plans not only encompassed the basic steel structure

but specifically addressed the design necessary to create sufficient traction. The expert's report stated:

The configuration on the surface of the steel deck members is a series of metal parallagrams [sic] ¼ inch to ⅜ inch above the surface of the member when new. They are placed in series as follows: 2 inch block ½ inch space, 1 inch block, ½ inch space, 1 inch block, ½ inch space, 2 inch block, etc. When new these blocks presented square ends and sharp edges to directional traffic and acted as a deterrent * * *.

In a subsequent letter to clarify the meaning of "deterrent," plaintiff's expert stated that "the original design for the grid provided the required traction to permit safe passage across the bridge deck."

■ Because the evidence demonstrates that the bridge's steel grid was an approved feature of the original design, and in light of the additional evidence that the original plans specifically considered how to create traction on the bridge's surface, we conclude that the trial court correctly determined that the State has met its burden of proof in establishing the applicability of plan-or-design immunity.

Plaintiff disagrees and posits her claim on several grounds. She argues that for plan-or-design immunity to insulate the State from liability for the bridge's current condition, the State must show that, at the time it approved the plans for the bridge, it (1) "contemplated that the bridge surface would erode with time, and (2) * * * [intended] to ignore it * * * [as part of] a reasonably calculated plan which would maintain the bridge safe for its intended purposes." Moreover, she implies that because studs were not considered in the original plan or design, the State's decision regarding whether to install studs now is not protected by the immunity. Alternatively, she characterizes the installation of studs as a maintenance function that is not protected by the plan-or-design immunity.

■ Essentially, all of plaintiff's arguments fail because they improperly attempt to circumvent the perpetual nature of plan-or-design immunity. The official comment to § 59:4–6 states:

> *It is intended that the plan or design immunity provided in this section be perpetual. That is, once the immunity attaches no subsequent event or change of condition shall render a public entity liable on the theory that the existing plan or design of public property constitutes a dangerous condition.* After several years of difficulty with this immunity in California, the California Supreme Court adopted a contrary approach and concluded that plan or design immunity was not perpetual in California. * * * After consideration, this approach has been specifically rejected as unrealistic and inconsistent with the thesis of discretionary immunity—that a coordinate branch of government should not be second-guessed by the judiciary for high level policy decisions.
> [ (Citations omitted) (Emphasis added).]

Thus, any claim that undermines the State's perpetual immunity unduly interferes with the protection accorded the State's decisions.

Plaintiff argues that the State must have specifically considered the bridge's future deterioration and decided not to maintain it in order to have the benefit of plan-or-design immunity for its present condition. That contention ignores the legislative comment's clear statement that "changed" or "unanticipated" circumstances do not defeat the plan-or-design immunity. As we have frequently observed, the immunity is not lost even if new knowledge demonstrates the dangerousness of the design, or the design presents a dangerous condition in light of a new context. *Thompson v. Newark Hous. Auth., supra,* 108 *N.J.* at 532–33, 531 *A.*2d 734; *Birchwood Lakes, supra,* 90 *N.J.* at 599, 449 *A.*2d 472; *Kolitch v. Lindedahl,* 193 *N.J.Super.* 540, 475 *A.*2d 86 (App.Div.1984), *rev'd on other grounds,* 100 *N.J.* 485, 497 *A.*2d 183 (1985). In *Kolitch,* the Appellate Division considered a dangerous curve in the road that had been the site of many accidents. The road had been built in 1925 and was safe for cars travelling at the 1925 speed limit of thirty miles-per-hour. Based on the perpetual plan-or-design immunity provided by § 59:4–6, the court concluded that "the State is shielded from liability for the condition of the roadway even though dangerous at 50 miles per hour," the currently-posted speed limit. *Id.* at 545, 475 *A.*2d 86. We affirmed that portion of the opinion in *Kolitch v. Lindedahl, supra,* 100 *N.J.* at 497, 497 *A.*2d 183. See also *Ciambrone v. State, Department of*

*Transportation,* 233 *N.J.Super.* 101, 558 *A.*2d 47 (App.Div.) (although new traffic conditions rendered timing of traffic signals dangerous, plan-or-design immunity protects State's approved decision to adopt that sequence), *certif. denied,* 117 *N.J.* 664, 569 *A.*2d 1356 (1989).

Immunity applies regardless of whether the "changed condition" is external, like the advent of faster automobiles in *Kolitch,* or intrinsic to the design of the infrastructure in question, like the deterioration of the bridge's surface in the present dispute. Were we to agree with plaintiff and hold that the deterioration of the original structure abrogates the immunity because that deterioration was not an approved feature of the design, we would undermine the perpetual nature of the immunity. As the official Comment discloses, the Legislature specifically intended to create perpetual immunity and specifically rejected California's decision to forego it. Hindsight may frequently reveal the error of an earlier decision. The Legislature, however, has determined that the burden of that error is not to be borne by the public coffer.

█ Plaintiff also implies that because the original plans did not include the installation of metal studs to increase traction, the studding option was not explicitly considered and the decision on whether to install studs is therefore not immune. The argument misinterprets our holding in *Thompson, supra,* 108 *N.J.* 525, 531 *A.*2d 734, and in so doing ignores the Legislature's intent to make plan-or-design immunity perpetual. In *Thompson,* the plaintiffs sued the City of Newark for negligence for failing to install smoke detectors in their housing. We held that the State had not demonstrated the applicibility of plan-or-design immunity because it had not presented "evidence that the plans embraced the condition about which plaintiff complained." *Id.* at 537, 531 *A.*2d 734. However, we did not require that the State demonstrate its conscious rejection of *smoke detectors* in order to qualify for the immunity. *Ibid.* We stated explicitly that "we do not intend or mean that a

public entity must necessarily show that a feature of the plans (such as smoke detectors) was specifically considered and rejected." *Ibid.* Rather, we held that there was no evidence that the State had considered the more general issue of *fire safety*. *Ibid.*

■ In *Thompson* the State did not present evidence that it had considered the feature of concern, fire safety. Here, however, the evidence clearly demonstrates that the State specifically *did* consider the design of the bridge's surface and the general issue of traction. The State is not required to explicitly consider and reject all conceivable design options before receiving immunity for the option chosen. Immunity attaches to the State's decision regarding how to design a particular *feature*, and does not turn on explicit consideration of specific *options*.

If we were to hold that immunity attaches to the consideration of the option rather than the feature, then the State's perpetual immunity might be undermined whenever the suggested option was a recent scientific advance. By definition, a recent advance could not have been considered in the original planning process. If the decision regarding its adoption were therefore not immune, then the immunity accorded the original decision would be jeopardized by every new scientific advance. As we noted in *Thompson*, the principle of perpetual immunity is "applicable to a change in circumstances wrought by an increase in scientific knowledge * * *." 108 *N.J.* at 533, 531 *A.*2d 734.

■ Alternatively, plaintiff argues that she is not challenging the original design of the bridge. Rather, she asserts that the State had a duty to maintain it, and that that duty required the State to install metal studs. The dissent believes this is the central issue of the case. *Post* at 362, 609 *A.*2d at 767. Plaintiff relies on cases that have held that a public entity could be liable for negligently-performed maintenance. *See Costa v. Josey, supra,* 83 *N.J.* 49, 415 *A.*2d 337; *Daniel v. State, Dep't of Transp.,* 239 *N.J.Super.* 563, 571 *A.*2d 1329 (App.Div.),

*certif. denied,* 122 *N.J.* 325, 585 *A.*2d 343 (1990). However, those cases establish only that a public entity will be liable for its negligent acts of maintenance. They do not directly address the duty to maintain.

■ Notwithstanding plaintiff's phrasing, the facts of this case and the arguments presented simply do not present the issue of maintenance. Plaintiff argues that installing metal studs is a "maintenance" activity because it recreates the traction the bridge has lost over the years. We disagree. Installing studs cannot be termed maintenance. Simply put, studs were not part of the original design of the bridge, and adding them does much more than return the bridge to the status quo. Instead, it fundamentally changes the design of the bridge surface and constitutes a new and improved design to increase traction. No one argues that the State has a duty to undertake design improvements. That fact cannot be avoided by labeling the desired improvement a "maintenance" activity. We thus believe the dissent takes too literally plaintiff's unsupported claim that the source of the danger stems from the State's failure to maintain the bridge. Had plaintiff alleged, for example, that the State's failure to paint the bridge caused rust that rendered the bridge a "dangerous condition" causing plaintiff's injuries, we would be confronted with the question of the State's liability for its failure to maintain. Because plaintiff raises only the State's failure to install studs, however, the issue of the State's failure to maintain is not properly before us.

■ In sum, the Act's perpetual plan-or-design immunity provides immunity for an approved feature of a system even if, over time, the condition of the feature, such as the bridge surface, changes. Moreover, immunity for an original design does not fail because alternative options regarding the feature of concern, such as studding, were not considered in the original plans. Finally, a plaintiff cannot cast a design improvement as a "maintenance" action to circumvent the immunity given

the original design. The Legislature's grant of perpetual plan-or-design immunity evidences its intent to protect the State when its planning decisions have resulted in dangerous conditions.

## VI

We affirm the judgment of the Appellate Division.

STEIN, J., concurring in part and dissenting in part.

Reduced to its simplest terms, the Court's opinion today holds that when the State builds a bridge with a steel-grid deck that eventually will be worn smooth, the State need not maintain the surface to make it safe again. Accordingly, the State may stand by while motorists are put at risk, and will enjoy immunity if injuries result. That cannot be the intended application of the Tort Claims Act.

## I

Joseph Manna died as a result of injuries sustained in a car accident on the Matawan Creek Bridge in Aberdeen when his car slid out of control and into the oncoming lane of traffic. The twenty-six-year-old bridge was wet and slippery from an earlier rainfall. Decedent's wife, Gail Manna, filed an action against the State of New Jersey and the State Department of Transportation (State), claiming that the State had negligently constructed, maintained, repaired, and serviced the bridge and had failed to provide adequate warnings of the bridge's dangerous condition.

In support of its motion for summary judgment, the State offered the affidavit of Nicholas J. Cifelli, the Department of Transportation's (DOT) Regional Director for Region III and a Licensed Professional Engineer. Cifelli stated that he had reviewed the "as-built" plans for the bridge, and that the bridge design, including the paved portion and the steel-grid section, had been "approved in advance of construction" by the State Highway Commissioner and other officials bearing the authori-

ty to issue such approvals. Although Cifelli did not indicate whether he had ever personally inspected the bridge, he represented that the bridge had been constructed in accordance with the approved plans. He concluded that on July 19, 1986, the date of Mr. Manna's accident, the bridge "was substantially the same as was shown in the various as-built plans."

Plaintiff submitted the report of Richard A. Haber, a consulting civil engineer, who had evaluated the bridge's condition following the accident through reports, photographs, reconstruction contracts, and by personally inspecting the site. He found that the open-mesh-steel grid had been installed in 1960 with a configuration of "blocks" that served as a deterrent to skids. Haber concluded that the "blocks" had worn away so that they were "now part of a smooth, skidprone surface" that would retain a water film and allow hydroplaning. The police report following the accident described the deck surface at the time of the accident as "very slippery." Accident records indicated that the bridge had been involved or a critical factor in forty-eight accidents between January 1975 and July 1986.

The trial court first determined that plaintiff could establish a *prima facie* case that a dangerous condition had existed, as set forth in *N.J.S.A.* 59:4–2. Nevertheless, the trial court granted the State's motion for summary judgment, concluding that plaintiff's claim was barred by both the weather and the plan-or-design immunities. In an unpublished opinion, the Appellate Division affirmed the trial court's ruling although it expressly declined to discuss the applicability of the plan-or-design immunity. The Court holds that the State failed to establish conclusively the applicability of the Tort Claims Act's weather immunity, a conclusion with which I agree; the majority further concludes that the plan-or-design immunity shields the State from liability.

## II

The "plan or design" immunity provision of the Tort Claims Act, *N.J.S.A.* 59:4–6(a), immunizes the State from liability stem-

ming from injuries "caused by the plan or design of public property, either in its original construction or any improvement thereto, where such plan or design has been approved in advance of the construction or improvement" by the Legislature or authorized officials. We have held that for "plan or design" immunity to attach, the public entity must demonstrate that an approved feature of the plan adequately addressed the dangerous condition that is causally related to the accident. *Weiss v. New Jersey Transit,* 128 *N.J.* 376, 389–90, 608 *A.*2d 254 (1992); *Thompson v. Newark Hous. Auth.,* 108 *N.J.* 525, 536, 531 *A.*2d 734 (1987); *Birchwood Lakes Colony Club v. Medford Lakes,* 90 *N.J.* 582, 599, 449 *A.*2d 472 (1982); *Daniel v. New Jersey Dep't of Transp.,* 239 *N.J.Super.* 563, 597, 571 *A.*2d 1329 (App.Div.), *certif. denied,* 122 *N.J.* 325, 585 *A.*2d 343 (1990); *Ciambrone v. New Jersey Dep't of Transp.,* 233 *N.J.Super.* 101, 105–06, 558 *A.*2d 47 (App.Div.), *certif. denied,* 117 *N.J.* 664, 569 *A.*2d 1356 (1989); *Ellison v. Housing Auth.,* 162 *N.J.Super.* 347, 351, 392 *A.*2d 1229 (App.Div.1978).

According to the majority, the State established the applicability of the plan-or-design immunity because of evidence, presented by both the State's and plaintiff's experts, that "the bridge's steel grid was an approved feature of the original design," and that the original plans "specifically considered how to create traction on the bridge's surface." *Ante* at 354, 609 *A.*2d at 763. That analysis, however, misconstrues the issue before the Court. Plaintiff does not contend that the bridge design was faulty or that it should not have required maintenance. Nor does plaintiff contend that the original design should have required installation of metal studs to increase traction. Rather, plaintiff asserts that the State is liable because the State failed adequately to maintain the bridge's surface, which it could have accomplished by replacing the steel-grid surface, by installing studs, or by some other method that retained the steel-grid design but provided adequate traction.

Contrary to the majority's contention, the original plan's attention to the traction issue does not immunize the State for

the bridge's deteriorated condition twenty-six years after it was constructed. Evidence that "the bridge's steel grid was an approved feature of the original design" is irrelevant to the applicability of plan-or-design immunity because that proof does not address whether the plan contemplated future maintenance of the bridge in case the steel grid became worn. *See Thompson, supra,* 108 *N.J.* at 531, 534–35, 531 *A.*2d 734 (concluding that immunity cannot attach for failure to install smoke detectors in Housing Authority apartments when plans did not cover smoke detectors or other fire-safety design features); *Costa v. Josey,* 83 *N.J.* 49, 53, 415 *A.*2d 337 (1980); *Ellison, supra,* 162 *N.J.Super.* at 351, 392 *A.*2d 1229; *see also Weiss, supra,* 128 *N.J.* at 386, 608 *A.*2d 254 (Handler, J., dissenting) (concluding that failure to implement railroad-crossing safety system was not flaw in design and therefore not subject to plan-or-design immunity); *Flournoy v. State,* 275 Cal.App.2d 806, 80 *Cal. Rptr.* 485, 489 (1969) (concluding that ice on roadbed that allegedly caused accident "was not an element or feature of the plan or design" of the bridge). To establish plan-or-design immunity, the State would have had to prove that the original plan specifically contemplated that no maintenance or resurfacing would be performed when the original steel deck became worn. Here, no such proof was offered. Consequently, the condition that purportedly led to the accident—failure to maintain the bridge surface—was not contemplated by the original plans, and the plan-or-design immunity does not apply to plaintiff's claims.

Nor does the perpetual nature of the plan-or-design immunity compel its application. The plan-or-design immunity is perpetual and is not lost "if later knowledge shows a design or plan to be dangerous, or later circumstances render it dangerous." *Thompson, supra,* 108 *N.J.* at 532, 531 *A.*2d 734 (quoting Harry A. Margolis & Robert Novack, *Claims Against Public Entities* 72 (1990)); *see* 1972 Task Force Comment to *N.J.S.A.* 59:4–6. Thus, the perpetual nature of the immunity protects the discretionary acts of high-level government officials from judicial

second-guessing in the event that later-acquired knowledge or circumstances cast doubt on the wisdom of those decisions. *See* Note, *The New Jersey Tort Claims Act, Section 59:4–6— Public Property Plan or Design Immunity,* 26 *Rutgers L.Rev.* 838, 840 (1973). Nevertheless, we have already determined that the perpetual nature of the immunity does not immunize a public entity for a dangerous condition caused by its negligence in maintaining public property. *See Costa, supra,* 83 *N.J.* at 53–54 n. 1, 415 *A.2d* 337. Further, the majority misconstrues the perpetual nature of the immunity when it characterizes the deterioration of the bridge's surface as a "changed condition" that would not disturb the State's plan-or-design immunity. *Ante* at 356, 609 *A.2d* at 764. The deteriorated bridge surface here is different from those changed conditions involving new technology, *see Kolitch v. Lindedahl,* 193 *N.J.Super.* 540, 545, 475 *A.2d* 86 (App.Div.1984), *rev'd on other grounds,* 100 *N.J.* 485, 497 *A.2d* 183 (1985); *Ciambrone, supra,* 233 *N.J.Super.* 101, 558 *A.2d* 47, or the subsequent adoption of more stringent safety codes or regulations, *see Thompson, supra,* 108 *N.J.* at 532–33, 531 *A.2d* 734; *Rodgers v. Passaic Hous. Auth.,* 139 *N.J.Super.* 569, 572–73, 354 *A.2d* 681 (App.Div.), *certif. denied,* 71 *N.J.* 337, 364 *A.2d* 1069 (1976), because it does not involve the acquisition of information unavailable at the time of the initial decision. Accordingly, a claim that the State failed to maintain an otherwise adequately-designed bridge surface does not unfairly subject the discretionary decisions of government officials to scrutiny based on subsequent developments. The perpetual nature of the immunity should not eliminate the State's duty to maintain and repair its public facilities and should not bar plaintiff's claim.

Moreover, to extend immunity here obviates the State's duty to repair and maintain its roads and bridges. *See Daniel, supra,* 239 *N.J.Super.* at 589, 571 *A.2d* 1329 (noting State's obligation to "construct and maintain its roads in a reasonably safe condition for their intended use"); *Whaley v. County of Hudson,* 146 *N.J.Super.* 76, 79, 368 *A.2d* 980 (Law Div.1976) (holding that Legislature extended governmental liability to

road defects caused by wear and tear). Extended to its logical limit, the majority's holding might immunize the State if, for example, an accident resulted from a bridge that had collapsed due to lack of maintenance, provided that the original plan and design had been properly approved. Further, the majority's result contradicts our prior acknowledgment that plan-or-design immunity "does not immunize a governmental body from responsibility for dangerous conditions created by its careless or negligent affirmative acts arising out of its maintenance," *Costa, supra,* 83 *N.J.* at 53 n. 1, 415 *A.*2d 337.

I cannot conceive that the Legislature intended the Act to immunize the State from the negligent failure to maintain a steel-deck bridge that had been worn smooth from regular use over twenty-six years. Accordingly, I would reverse the judgment of the Appellate Division.

Justice Handler joins in this opinion.

*For affirmance* —Chief Justice WILENTZ and Justices CLIFFORD, POLLOCK, O'HEARN and GARIBALDI—5

*Concurring in part; dissenting in part*—Justices HANDLER and STEIN—2